NF

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

RECEIVED

NOV 07 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1:16-cv-10439
Judge Virginia M. Kendall
Magistrate Judge Mary M. Rowland
PC10

JACK MANN,
Plaintiff,

v.

RESIDENTIAL REENTRY MANAGER CHICAGO,
Defendant.

**EMERGENCY HABEAS CORPUS FOR EMERGENCY ORDER PROVIDING IMMEDIATE EMERGENCY RELIEF IN RRC PLACEMENT AND FOR OTHER RELIEF**

NOW COMES, Plaintiff Jack Mann, (hereinafter 'Mann'), pro-se, with the above named Habeas Corpus action and, in support thereof, states as follows:

1. On or about June of 2016, Mann was informed by Case Manager Guthrie that Mann was going to be submitted to 6-9 months halfway house. RRM Chicago makes the decision.

2. On or about June of 2016, Mann was told verbally by Case Manager Guthrie that the only way the Halfway House (RRC) Package would be sent in with up to 9 months is IF and only IF Unit Manager Edwards approved of the specific time range (6-9 months) prior to Mann signing the RRC Package. RRM made the decision.

3. On or about September of 2016, Mann was placed on a "call out sheet" to meet with Case Manager Guthrie and sign all of the necessary documents. This could only have been completed in the proper order of operations if Case Manager Edwards approved of this time range (6-9 months). RRM Chicago allowed Edwards racism to stand.

4. One week or two after the signing of these documents, Case Manager Guthrie stopped Mann in the Dining Hall Foyer to state that Unit Manager Edwards had a "change of heart" and that Mr. Edwards had decided to prevent the date range of 6-9 months for Mann's RRC. Mann was then instructed to meet with Edwards to discuss the reasons. Edwards failed to mention that RRM Chicago had allowed his racist views.

5. On or about 10/13/2016 Mann met with Mr. Edwards to discuss his new improved reasons for post-signatory RRC Package date range changes to a max RRC placement of 0-6 months. This racist decision was and is allowed by RRM Chicago.

6. Mr. Edwards stated that Mann had disciplinary incident reports. This had

been gone over by Mann, Mr. Edwards, Mr. Guthrie, and Mr. Keller in Mann's first Team Meeting at FCI Ashland. All of the men involved in Mann's Unit Team have been acutely aware of Mann's prior incident reports in the Bureau of Prisons. It is imperative at this juncture to point out that none of the incident reports in the Bureau of Prisons of a 300 or 400 nature (codes of violations) are illegal in any way in the United States. Further, it is imperative to point out that even a 100 or 200 code incident report is, more likely than not, not illegal in the United States. RRM Chicago knowingly allowed Edwards reversal of Mann's contract.

The U.S. Prison system is a subculture within a subculture. Federal prisoners are among criminals of the United States. U.S. Prisoners are a part of the "criminal subculture". Upon entry into a U.S. Prison these prisoners are now within a subculture within a subculture. There are many items that **must** be purchased with the currency within the "prison economy." This is to say various items are sold in prison; cold sodas, various commissary items (when the commissary is closed), cooked foods (from the kitchen or not from the kitchen of the dining hall), and vegetables which are **not** on the commissary. Currency within U.S. Prisons is, more likely than not, stamps or other commissary items.

7. Mr. Edwards stated that if Mann was given 9 months of RRC Placement that Mann would drink or smoke and violate terms of RRC. Mann then explained to Mr. Edwards, who had obviously not read Mann's file or drug use history, that Mann had been clean and sober for over 22 years. Mann explained that he had been clean and sober since 4/15/1994. Edwards immediately chose a new road to go down to justify his decision. This was a RRM Chicago backed reversal of Mann's signed contract.

8. Mr. Edwards stated that Mann would purchase stolen items "on the street" and then violate the terms of his RRC Placement. This statement was based on Mann's incident reports for "possession of anything not authorized" which were all, in fact, Mann's possession of chicken and vegetables from the kitchen. Mann then explained to Mr. Edwards that when Mann is in a halfway house in Chicago, Illinois there will be grocery stores that sell chicken and vegetables. Mann informed Mr. Edwards of this and Mr. Edwards stated, "well, it's my decision, I am not

putting you in for more than up to six months."

9. Edwards went on to say that IF Mann could get someone other than him (Mr. Edwards) to make the decision to provide Mann up to 9 months of RRC Placement that would be fine with Mr. Edwards. Mr. Edwards is simply not willing to make any decisions in favor of Mann who is, in fact, a white male from Chicago. Mr. Edwards is a black male and Unit Manager at FCI Ashland, which is a position of power of Mann and the other white males at FCI Ashland.

Mr. Edwards stated that if he signed off on this 0-9 months RRC Placement for Mann he would be under scrutiny and, therefore, subject to some kind of issues if Mann violated or obtained a new charge.

10. Mann immediately informed Mr. Edwards that if Mann had any violation or recieved a new criminal charge Mann would have to deal with any and all negative reflection -- not Mr. Edwards. Mr. Edwards stated, again, that he was not going to recommend up to 9 months RRC Placement.

11. Mann was an insurance professional for over twenty years prior to his arrest and, Mann has not been out of federal custody since that date (1/10/2010).

12. Mann is, in fact, a homeless man as he also had a divorce during his imprisonment.

13. Mann is estranged from all family members as they took it upon themselves to steal Mann's only asset in the world, through illegal conversion, RICO, and TCPA statutes which, not only cause him to literally beg old friends for money but also leave him without a home or money upon release. See **Mann v. Bales, et al.**, 2016 U.S. Dist. LEXIS 91053, Civil No: 4:15-cv-01440, July 12, 2016.

14. In the suit which renders Mann estranged from his family it states:

> This case involves a dispute between family members regarding the book of business of an insurance agency. Because this Court lacks personal jurisdiction over the defendants, we recommend that the Court grand the defendants' motions to dismiss. To best serve the interests of justice, however, we also recommend that the Court transfer the case to the United States District Court for the Northern District of Illinois.

**Id.**, REPORT AND RECOMMENDATION, I. Introduction, Opinion by: Susan E. Schwab.

15. Mann's Unit Team (Keller, Guthrie, and Edwards) are also aware of this suit and estrangement of Mann by his family. On October 7, 2016, Judge Brann in **Mann v. Bales, et al.** provided an **ORDER** which states:

> 1. United States Magistrate Judge Susan E. Schwab's Report and Recommendation (ECF No. 85) is ADOPTED in its entirety.

**Mann v. Bales, et al.**, 4:15-cv-01440-MWB, Doc. No: 104, 10/7/2016.

16. As a result of this suit and the obvious belief by a Magistrate Judge and a U.S. District Judge within the M.D. of PA, Mann is going to be treated very harshly by his siblings and ex-wife who have taken the liberty of illegaly converting his book-of-business without consent.

17. In order to attempt to get a job back in the insurance industry there are many steps Mann must take and, the process will be, more likely than not, more than a 9 month endeavor. As a result of this, Mann will have to attempt to find some kind of job that he can perform and assure it is within the insurance industry so that he shows there is a true willingness to continue working in the insurance industry. This process will take more than six months and, maybe even more than nine months but Mann is certain that between six and nine months will give him the proper ability to attempt these efforts in good faith.

18. The vindictive behavior of stealing Mann's book of business by his siblings and ex-wife through conversion and collusion and RICO will undoubtedly bleed over to the private sector when Mann is attempting to gain employment. This is a certainty as both of his siblings have contacted his customers in violation of restrictive covenants and a 1998 MUTUAL RELEASE AND SETTLEMENT AGREEMENT in G.F. MANN AGENCY, LTD. V. GEORGE F. MANN III & GLOBAL RISK SERVICES, LTD, DuPage County Illinois. This perpetuation of acts that are in line with RICO activity as well as collusion are what Mann is attempting to gain the extra halfway house time for. In order to gain his drivers license (old traffic fines), insurance license, and legal fees to gain both Mann will need a job. Mann requires, for his own purposes, a job in the insurance industry. Even a clerk position would at least get Mann into the industry again and, allow him to work toward paying

off his outstanding debts.

19. It is upon information and belief that Mann's siblings and his ex-wife would do anything in their power to slander Mann or prevent his employment by a separate insurance agency or insurance carrier.

20. The issues aforementioned are what will require Mann the most time available to him as allowable by the Second Chance Act. Mr. Edwards is not a big fan of Congress, its mandates, nor is he even a fan of the Second Chance Act or Mann who, Mann believes, is discriminated against because he is a white male from Chicago.

21. The request Mann made to Mr. Edwards was in writing and included the following case law information:

22. In an April 14, 2008 Memorandum the BOP references Prosgram Statement 7310.04, which provides that RRC placements for longer than 180 days are highly unusual, are only possible with extraordinary justification, and require approval from the Regional Director. The October 2008 regulations define community confinement and provide that inmates may be designated to RRC's near the end of their sentences for up to 12 months. 28 C.F.R. §§ 570.20-22 (2008). The regulations also provide that designations will be determined according to § 3621(b) and will be of sufficient duration to "provide the greatest likelihood of successful reintegration into the community." The November 14, 2008 guidance memorandum to staff relates to inmate requests for transfers to rRC's when they have more than twelve months remaining on their sentences. The November 14 Memorandum provides that all requests must receive individualized consideration under § 3621(b) at the inmate's next scheduled Program Review (Unit Team Meeting). The November 14 Memorandum also requires unusual or compelling circumstances and approval from the Regional Director for RRC placements beyond six months.

23. This is no longer the way in which RRC Placement is assured as per the decisions in **Rodriguez v. Smith**, 2008 U.S. Dist. LEXIS 103017 (E.D. Cal., Dec. 11, 2008). In Rodriguez the BOP failed to apply the necessary factors listed in 18 U.S.C.S. § 3621(b). In this case at bar not only did Mr. Edwards solely rely upon Mann's

incident report history but failed to take into consideration **any** of the circumstances regarding Mann's employment, civil suit issues (Mann v. Bales, et al.), nor did Edwards actions take into consideration the employment hurdles Mann will face with regards to the insurance industry.

24. 18 U.S.C.S. § 3621(b) gives the BOP the agency discretion. This delegation of discretion, however, is cabined by further mandatory direction to consider the five factors enumerated in the statute. Mr. Edwards failed to take into account any of the outstanding issues Mann has. Mr. Edwards is myopically focused on Mann's petty, unimpressive, and non-hazardous incident reports which are based upon a corrections culture in the BOP of writing inmates up for almost anything they can. This is to insure that inmates lose good time.

25. If a business **loses money** for every customer that leaves the premises then the goal of that business should be to keep the **customer** in the building. Along that same vein, the BOP **loses money** each and every time an inmate walks out the door. The employees of the BOP know this and, as a result, do certain things in their power to assure that good time credit is taken off of the back end of prisoners sentences. This is nothing more than increasing the revenues of the BOP by way of a line item in the House Appropriations Committee funding which allows for a "back end" payment for all the days that prisoners lose and have to stay in BOP custody. After all, all businesses must get paid for their services.

26. As per the Second Chance Act, the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. See Rodriguez v. Smith, 2008 U.S. Dist. LEXIS 103017 (E.D. Cal., Dec. 11, 2008).

27. Mann has a projected release date of 1/8/2018. By the time this case is given a case number the timing of 11-13 months for consideration of RRC placement will be ripe or passed.

28. Mr. Edwards and the Warden's allowance of the exercise of violating Congress's intention regarding the statutory inmate placement and transfer considerations the BOP must undertake this Court must grant Mann's petition to be granted additional halfway house time to undergo all of the issues he faces.

29. Congress states that the amount of RRC placement is to be any amount of time BOP deems necessary. In this institution under the Warden's guidance, Mr. Edwards is categorically assuring that inmates which are similarly situated to Mann are being kept to no more than six months of RRC placement in this institution. This is in direct violation of what Congress intended and, is also in direct violation of the findings in Rodriguez and Mihailovich v. Fed. Bureau of Prisons, 2007 U.S. Dist. LEXIS 22352 (N.D. Tex., Mar. 19, 2007).

30. In Rodriguez, the Court states:

> We are persuaded that the BOP regulations conflict with the provisions of § 3621(b). As the Third Circuit decision explained: "While the BOP may exercise considerable discretion, it must do so using the factors the Congress has specifically enumerated." Woodall, 432 F.3d at 247. We agree with the Third Circuit that an "unavoidable conflict" exists because the staTute requires the BOP to consider five factors in determining CCC placement, while the regulation provides that the enumerated factors will not be fully considered. Id at 249. We also join the Third Circuit in its conclusion that the regulations' construction is not "permissible...because they fail to take into account Congress's indications that certain individualized factors...should be considered ... " Id. (citation omitted); see also Levine, 455 F.3d at 85 ("Categorical rule-making, like all forms of agency regulation, must be consistent with unambiguous Congressional instructions..."); Fults, 442 F.3d at 1091.

Here, in this case, the staff at FCI Ashland is absolutely not in line with other federal prisons in the United States. This facility is taking these halfway house matters much too harshly and proving that there is a wide berth between the RRC Placement given at other institutions versus FCI Ashland. There is absolutely no uniformity, only a corrections culture based on the lousy six (6) weeks of training that is given to BOP employees upon hiring. The training is all about intimidation of inmates; how to shoot them with bean bag guns; how to use a tazer (which is only allowable in pilot institutions); how to fire tear gas; how to fight inmates. Time spent with conflict resolution, compassion, or even arbitration is not identified at all for this type of prisoner interaction. In fact, the way in which all prisoners in the federal bureau of prisons are treated by the federal officers (Mr. Edwards is a federal officer and a Federal Corrections Officer) who hold them captive is one of constant threats, intimidation, and oppresive oversight. Other nations like Germany have a two year training before an officer

is allowed to have oversight of an inmate. This is the opposite end of the spectrum from the way in which U.S. Corrections Officers are trained. In fact, the way in which they are trained in the U.S. and the way in which these federal officers are protected by the American Federation of Government Employees (AFGE) Union is a far cry or distance away from the way prisoners are supposed to be humanely treated. Clearly, when the U.S. holds less than 25% of the worlds population and over 50-75% of the **world's prison population** there is something severely wrong.

31. Through and by this corrections culture BOP employees are allowed to run individual federal prisons in a way that is in line with the belief system of an individual Warden or Unit Manager **feelings.** The fact that there is **no uniformity** in a federal agency is unbelievable. Interpritation should never be up to an individual federal employee.

32. The only factor that was considered was Mann's disciplinary record which, of course, takes away good time from the back end of his sentence for things which are not illegal. Rodriguez also states:

> Finally, we are not cinvinced that reference to some of the factors in the BOP regulations translates into compliance with the statutory command contained in § 3621(b). See Muniz, 517 F.3d at 39. As the Tenth Circuit astutely remarked:
>
> > The BOP cannot validate this otherwise invalid regulation by claiming to have categorically considered **the five** statutory factors during the rulemaking process. The individualized nature of three of the five **factors** - the nature of the prisoner's offense, the prisoner's history and characteristics, and the sentencing judge's statement - made such consideration impossible. Wedelstedt, 477 F.3d at 1168 (citing Fults, 442 F.3d at 1092); see also Woodall, 432 F.3d at 248.
>
> **CONCLUSION**
>
> The BOP's regulations conflict with the plain language of 18 U.S.C. § 3621(b) as to when an inmate may be considered for initial placement in or transfer to an RRC. We therefore AFFIRM the district court's order granting the writ of habeas corpus ordering the BOP to promptly consider Rodriguez for transfer to an RRC without reference to 28 C.F.R. §§ 570.20 and 570.21.
>
> **AFFIRMED.**

Similarly, Mr. Edwards at the direction of the Warden at this institution, is assuring that there are no additional time amounts included in the statement by Mr. Edwards.

A uniform amount of tme in a RRC is not a part of the BOP's day to day activity. The allowance by the Courts to provide a non-regulatory amount of halfway house (RRC) time is like allowing a non-regulated SBA loan which is up to the bank (not the government) to decide whether or not one piece of information is necessary. One piece of information like, let's say, a W2 or Credit Report. Essentially, the BOP is allowed to provide the same thing as a "No Doc" Loan when all the other banks are required to meet stringent standards.

Mr. Edwards, the Warden, nor the rest of the decision makers (if any) properly reviewed my situation which has led to a recommendation of **up to** 6 months as opposed to the original agreed upon and signed off on amount of **up to** 9 months.

**WHEREFORE**, Plaintiff Jack Mann prays that th is Honorable Court will provide Mann the following relief:

A. GRANT this Habeas Corpus ordering BOP to provide Mann a process that is void of the weight given to 100 and 200 level incident reports that are not illegal in the United States; and

B. GRANT this Habeas Corpus ordering the BOP to provide Mann a process is void of the weight given to all 300 and 400 series incident reports as they are not worthy of any weight; and

C. GRANT this Habeas Corpus ordering BOP to provide Mann a process that is void of giving any weight to any incident reports which have not been given in the last 12 months (a rolling 12 months) prior to the date of the RRC Packet being mailed out; and

D. GRANT this Habeas Corpus petition ordering the BOP to use the five factors contained in § 3621(b) in order to assure that Mann's personal and individual situation is taken into account; and

E. GRANT any such other and further relief as this Court deems just and proper.

Date: 10 / 31 / 2016

Jack Mann, 22865-424
FCI Ashland, PO BOX 6001
Ashland, KY 41105

CERTIFICATE OF SERVICE

I, Jack Mann hereby swear under penalty of perjury that on the date below this Habeas Corpus was submitted to the Court with a copy for the Court, the Clerk, and one to be returned to Mann stamped RECEIVED. This is in compliance with the Mailbox Rule.

Date: 10 / 31 / 2016

Jack Mann, pro-se

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JACK MANN, Plaintiff, | ) | No. TBD |
| v. | ) | |
| RESIDENTIAL REENTRY MANAGER CHICAGO, Defendant. | ) | |

**AFFIDAVIT AND DECLARATION OF JACK MANN**

NOW COMES, Plaintiff Jack Mann, with the following Affidavit and Declaration which Jack Mann swears under penalty of perjury the following is true and correct:

1. On or about August of 2016 Mann was told by his Case Manager that he was going to be placed on a "call out" to sign his halfway house papers.

2. During the meeting in August Case Manager Guthrie told Mann that in the coming months Mann would be signing his halfway house papers. Mr. Guthrie also told Mann that prior to Mann signing the **contract** the Case Manager (Guthrie) and Unit Manager (Edwards) would be going over the date range (amount of halfway house time) Mann would be recommended for.

3. During September of 2016, Mann was placed on another "Call Out" and met with Mr. Guthrie to sign the halfway house **contract.**

4. Prior to the **contract** being signed Mr. Edwards had to review this information and according to the internal processes and order of operations also had to approve of the date range of 181-271 days of RRC Placement (halfway house).

5. Shortly after this signing of the **contract**, Mr. Guthrie stopped Mann in the foyer of the Dining Hall and told him that it had been changed. Mr. Edwards had decided that Mann was not going to get the amount of halfway house that had previously been approved and included in the contract to go to the RRC. Approval at the institution is a quasi "pre-approval" as the BOP is not going to put any numbers on the contract that have not been chosen by the Unit Team. In this instance the Unit Team decision makers are Mr. Guthrie and Mr. Edwards.

6. Mann asked Guthrie why this had changed and Guthrie responded that Mann had to speak with Mr. Edwards to get an answer.

7. On or about October of 2016 Mann met with Mr. Edwards in regards to the changing of a signed contract. Mann is aware of his contract rights and, according to **Millbrook v. United States,** 133 S.Ct. ___, ___ March 27, 2013, 9-0 Decision **IF** a federal officer interferes with a prisoners **contract rights** and it is intentional, that is one of the requisite **six intentional torts** for a **FUTURE** FTCA Claim. In **Millbrook** only one is required, however, there are many more Edwards violated.

8. When Mann met with Edwards he told Mann that if he was given nine months of halfway house that Mann would just "smoke and drink and get a violation." After this was said to Mann in a condescending tone, Edwards was looking down at Mann with disdain. Mann then asked if Edwards had looked in Mann's Central File because it is proven in Mann's Presentence Investigation Report that Mann has been clean and sober since 4/15/1994. That is 22 years as of the writing of this Affidavit. Edwards immediately went another route.

9. Edwards then stated, after looking around on his computer, that Mann had incident reports for stealing. Mann clarified this as him being in receipt of "stolen items." As soon as Mann said this, Edwards did not give Mann a moment to continue as he jumped in and said, "If I was to give you nine months halfway house you would wind up with a new charge for receiving stolen goods and have a violation of your RRC." Mann shook his head and told Mr. Edwards that when he was in Chicago, Illinois there was bound to be a grocery store that sold Fried Chicken and Vegetables as that is all Mann had ever been caught with. Stolen items that were sold to Mann in his housing unit. Mann, on one occassion, did pick up chicken in the dining hall at Milan, Michigan as it was a lower cost to take it out of the Dining Hall on your own. Mann was caught taking the chicken and powdered milk out of the Dining Hall at FCI Milan and therefore in possession of chicken (fried) and onions, bell peppers, and powdered milk (for an alfredo sauce). There were a couple more times, to the best of Mann's recollection but he cannot remember.

10. Edwards then fell back on his old standby response, "My decision is final and I am only comfortable with you getting up to six months halfway house." Mann continued

his argument and was left with the same answer formatted in different ways until the truth finally dawned on Mann. Edwards does not like Mann because he is white and from the "North." Chicago is considered a Northern City to people from the Kentucky/Ohio/West Virginia borders. Mann recalls Edwards stating that "you people are not going to dictate the halfway house time." Mann knows that this meant WHITE needed to be put in place of "you". Then the sentence is going to sound like Edwards wished it to sound. "White people are not going to dictate the halfway house time." The way Edwards stated this was as if there was something in the room that stank of death warmed over. Edwards was finding it very unpleasant to speak to Mann. At some point Mann was glad he had taken a shower and brushed his teeth because normally he would wonder if that was the problem. Mann had his second shower of the day before this and it was just a wish to be clean - not to impress Edwards. Had Mann not showered prior to the meeting he would have wondered if it was him that smelled because the look on Edwards face was that humans get when they smell a dead animal or old curdled milk.

11. Mann received other answers that were telling Mann that if Mann could get someone higher up than Edwards to sign off on this then he would be fine with it because he did not want anything negative to reflect on him. This is when Mann also realized that when people in the business world reach their level of incompetence they make a decision to **NOT MAKE A DECISION.** The way that this was put to Mann made Mann realize that any attempt to gain a positive decision from the Acting Warden (Bishop) would be an attempt in futility. The kind of time frame that it takes to complete the Administrative Remedy Process is much longer than 4 months and is, more likely than not, going to take six months. This renders the entire Administrative Remedy Process futile.

12. Exhaustion prerequisite of 2241 is "not a statutory requirement." See Gates-Bey v. U.S. Parole Comm'n, 9 Fed. Appx. 308, 2001 WL 303512 (6th Cir. 2001). A federal prisoner who procedurally defaults on his administrative claims must still demonstrate cause and prejudice for the omission. See Engle v. U.S., 26 F. App'x 394, 396 (6th Cir. 2001)(citing Moscato v. Fed. Bureau of Prisons, 98 F. 3d 757, 760 (3d Cir.

1996)). Mann believes the prejudice in this case is the fact that Mann is white and from the Northern States where Edwards is a Black man from the Southern States. The amount of prejudice shown by Edwards is shown quite regularly. Evidence is proven in the Affidavit of Michael Fiorito as well as the Affidavit and Certification of Jack Mann.

13. Edwards strategic way in which he approved Mann's halfway house, allowed the Package to be created and signed, only to then reverse the contract, is proof of how vindictive Edwards is toward White males from the North. In order to make the Administrative Remedy Process futile and hope that Mann is not able to get any "traction" from a § 2241, FCI Ashland does this by design. RRM Chicago knows Edwards negated Mann's contract, and RRM Chicago knows how Edwards attempts to make remedies futile but force an inmate to go through them anyway. This way Edwards and his ilk (who either are or are not prejudice against White males from the "North") are not able to get forward at all with a §2241 claim.

14. Two white males from the Chicago area have been treated more than poorly by Edwards in the last few months. There is nothing left for these two to do but to make this all a part of court proceedings in the N.D. of Illinois.

15. Bringing up drugs and alcohol was a weak attempt, however, in Edwards knowledge of dealing with these U.S. Prisoners, and working in halfway houses (which is unconfirmed) he must know that is typically the way in which inmates violate halfway house. Mann is, of course, clean and sober. Edwards was barking up the wrong tree. Then, Edwards tried to equate chicken purchased from Dining Hall workers to purchasing "stolen goods" on the streets of Chicago. Mann wonders if anyone in Chicago purchases their vegetables on the streets of Chicago's West Side (Mann will be at a halfway house located in the Austin District) sold by someone who accepts stamps or packages of Mackeral for payment. Mann doubts it and Mann will not have any stamps or Mackeral to purchase these with. Mann only wishes to buy poultry and produce at reputable grocery stores. This point was lost on Edwards or, he merely covered up what he believed to be true and kept on going with the fiction that Mann would be receiving stolen goods on the street such as chicken and onions. This is totally improbable.

16. Edwards racism toward Mann and other inmates is well documented, and not hidden. Edwards saw that Mann was a white male from Chicago, Illinois and, Mann had completed and signed his contract for halfway house and decided to interfére with Mann's contract rights. The way Edwards interfered was with the pre-approved (by Edwards) term of halfway house (six to nine months). Edwards made the agreement null and void after it was signed by Mann and Case Manager Guthrie. This was done after Edwards had already approved the term of RRC Placement of six to 9 months. Edwards "flip-flop" is a historic way in which he has treated white males from the Northern states.

17. Mann was walking out of the Dining Hall on 10/26/2016 and approached Mr. Guthrie about this situation. Mann explained that he did, in fact, receive a response from Mann's INMATE REQUEST TO STAFF, **EXHIBIT 1** wherein Mr. Edwards responded to the 10/12/2016 request with a hand written, almost totally illegible note at the end which stated:

> "a review of your documentation & request was conducted by the Unit Manager. All information was taken into consideration as well as your disciplárj [sic] & adjustment issues. The Unit Manager contends that an appropriate decision was made for a request of 6 months RRC placement!" Signed with initials "DE" which stand for Donovan Edwards, dated 10/24/16.

**EXHIBIT 1.**

18. Mihailovich v. Fed. Bureau of Prisons, 2007 U.S.Dist. LEXIS 22352, March 19, 2007 is proof that inmates are to receive extra halfway house (RRC)(CCC) time via a § 2241.

19. Importantly, Mr. Edwards did not include any information from the form that is used to show how exactly Edwards did, in fact, weigh the five factors for deciding how much halfway house (RRC)(CCC) a federal prisoner recieves. This form is known in the Bureau of Prisons as a BP338 and, Mr. Edwards did not include this form with his very short, hand written response to Mann. Evidencing even further that Edwards is treating Mann in a racist way is through and by the failure to provide him a professional response as well as a copy of the BP338. Within 18 U.S.C. § 3621 it states clearly, "In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high

> social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.

18 U.S.C.S. § 3621.

20. Not only could Mr. Edwards transfer Mann to another facility to assure he would no longer treat Mann with prejudice and racism but, Mr. Edwards could transfer Mann to assure that another Unit Team have to make a decision about Mann all together. If Mr. Edwards is never supposed to utilize racism or prejudice against a U.S. Prisoner, then there is no explanation as to why he chose to treat Mann with disdain, animus, and state, "You guys are always attempting to be in charge of something..." which inferred that the two words "You guys" meant **WHITE PEOPLE**.

21. Within the **AFFIDAVIT OF MICHAEL FIORITO**, **EXHIBIT 2** it states:

> 4. At least one time during the conversation Edwards stated, "you white guys from up there [North] really think you're runnin things."

This clear way of dealing with whites by Edwards, who is black, is a showing of racism. No one uses the term "you white guys" or "you black guys." If they do use those terms it is immediately classified as racism, as it is in this case.

22. It is common knowledge that Donovan Edwards (Unit Manager) was moved from the Regional Office or Central Office due to his discrimination toward white people. This has been spoken about in front of inmates at FCI Ashland by Corrections Officers who will remain anonymous until such time that discovery has begun.

23. On 10/26/2016 Mann also explained to Mr. Guthrie that he (Mann) did not receive a copy of the signed contract between himself and the Bureau of Prisons which did, in fact, outline that he would be submitted to RRC for six to nine months. Mr. Guthrie stated that he would provide Mann with a copy of the signed forms and/or the entire contract as this was information that was supposed to be given to Mann. Guthrie also told Mann that he was going to be leaving for "a while" and that he

would get the copies of the signed contract signature pages from the contract which should have been in Mann's hands as of the signing of this submission to the U.S. Court. These documents are not in Mann's posession as of the date of this submission. In an extremely typical way to treat U.S. Prisoners improperly, Guthrie is now treating Mann as if his correctional needs are not important.

24. Mann has been mistreated by staff with disrespectful language and conduct. By lying to Mann stating that he (Guthrie) would provide the documents to Mann and not providing these documents to Mann Mr. Guthrie is only perpetuating the ongoing and perpetual disrespect shown to inmates in the Bureau of Prisons at all times. In fact, if Mann lied to a BOP employee and told them he would do something, and then not perform the task, Mann would be written up with an INCIDENT REPORT. This type of double standard is the norm in the BOP. For a corrections officer to write up a prisoner it is a one page process (perhaps two page process) that only has to be completed on time. The tasks for an inmate to write up a corrections officer is a long and laborious process known as the PLRA Administrative Remedy process. This involves a BP8½ (takes up to 30 days to get a response); BP9 (takes up to 40 days to get a response; BP10 (takes up to 60 days to get a response); and a BP11 (takes up to 90 days to get a response). When the times are totalled this is a possible six months to gain a response and move the case to court. In the case of a corrections officer, after they write up the incident report the inmate has to go through a Unit Disciplinary Committee. Then if the Unit Disciplinary Committee (UDC) recommends the incident report move to the Disciplinary Hearing Officer (Regional Employee/Regional Function) for a DHO Hearing then, again, the prisoner must attend that as well. The disparity between disciplinary notification by an inmate of a corrections officer and disciplinary notification by a corrections officer of an inmate is great. These two processes are not of the same kind, or disparate. Disparity is "the quality or state of being different." The Merriam-Webster Thesaurus, ISBN 978-0-87779-637-4 (def. disparity n.). If the disciplinary process between inmates and corrections officers are so different and both are U.S. Citizens, then this is a violation of due process. Both types of groups in a prison environment

should be treated similarly. This, however, is not the case and in this microcosmic society known as prison, the disparity of treatment and punishment when a federal officer commits acts that should be punishable by law and inmates who commit acts that are **not** punishable by law is so great it can only be known as preferential treatment to federal officers. Preference n. a person or thing that is preferred over others. Merriam-Websters Thesaurus, ISBN 978-087779-637-4 (def. Preference.)

25. Mann is being treated with disparate treatment, racist behavior, and disrespectful behavior by federal officers. Mann has a remedy process that is not available to him. By making these decisions which are specifically prejudicing Mann the corrections officers/federal officers are providing further proof that they are totally in alliance against Mann. This collusion is also creating a type of civil conspiracy that could be deemed as Civil RICO (18 U.S.C. § 1964). Mann has a plausible claim for Civil RICO as well as the other issues at hand. This additional issue of Civil RICO will provide treble damages to Mann upon proof of the elements to this Court.

26. Mann is willing to forego any and all claims through and by a Mutual Release and Settlement Agreement or similar which provides Mann with a submission to the RRC in Chicago that states a RRC Placement term of 6-9 months.

**WHEREFORE,** Plaintiff Jack Mann prays that this Honorable Court provide him with the following relief:

A. GRANT Mann the ORDER which insturcts the BOP to submit paperwork information to RRC Chicago showing RRC Placement of 6-9 months (181-271 days halfway house); and

B. GRANT Mann the ORDER which is an EMERGENCY ORDER that must be acted upon within 2-3 days of its being decreed by this Honorable Court; and

C. GRANT Mann any such other and further relief as this Court deems just and proper.

Date: 10 / 31 / 2016

Jack Mann / 22865-424
FCI Ashland / PO BOX 6001
Ashland, KY 41105

CERTIFICATE OF SERVICE

I, JACK MANN Swear the above is true & Correct

I, Jack Mann, hereby swear under penalty of perjury that on the date below this submission to the U.S. Court was mailed using the USPS in full compliance with the MAILBOX RULE.

Date: 10 / 31 / 2016

Jack Mann, Pro-se

Exhibit 1

**INMATE REQUEST TO STAFF**

TO: MR. EDWARDS DATE: 10/12/2016

FROM: JACK MANN REG#: 22865-424

Message:

I am certain that the B.O.P has the statutory authority under 18 U.S.C. § 2624(c) to allow additional halfway house or RRC placement.

Further, in the BOP Program Statement, 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure:

> Therefore, the Bureau is not restricted by § 3624(c) in designating a CCC for an inmate and may place an inmate in a CCC for more than the "last ten per centum of the term," or more than six months, if appropriate.

PS 7310.04, 5. STATUTORY AUTHORITY.

Under 18 U.S.C. § 3621. Imprisonment of a convicted person the five factors which are utilized in deciding whether or not CCC placement is proper are as follows:

1. The resources of the facility contemplated; The RRC located on Chicago's West Side is at or near the corner of Chicago Avenue and Menard. This is close to the areas, at least through and by public transportaion, where I will be attempting to gain employment. This is close enough to the City of Chicago's business district that I can attempt this process throughout a nine month period. Further, I am homeless with no family in the area and, therefore, I will be working toward gaining the proper assets to gain a vehicle, place to live, clothes, etc.

2. Nature and circumstances of the offense; My offense does not bar me from obtaining RRC placement.

3. The history and characteristics of the prisoner; My history and characteristics do not preclude me from obtaining additional RRC placement under the Second Chance Act.

4. Any statement by the court that imposed the sentence--
   A. concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
   B. recommending a type of penal or correctional facility as appropriate;
None of the sentencing documents preclude my gaining additional RRC placement through and by the transcripts of Judgment & Committment Order.

5. Any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28. None of these issues preclude me from gaining any additional RRC placement.

Please allow me to gain the additional three (3) months of halfway house so that I can have a longer period of time to find employment, housing, and transportation. It is upon information and belief that I need the additional halfway house. I was told by Mr. Guthrie that I was being put in for up to 9 months. On 9/11/2016 I was told that you had decided to change it back to 6 months. I would like you to re-consider this and place me back at 9 months.

Thank you. [signature]

§ 3621. Imprisonment of a convicted person

(a) **Commitment to custody of Bureau of Prisons.** A person who has been sentenced to a term of imprisonment pursuant to the provisions of subchapter D of chapter 227 [18 USCS §§ 3581 et seq.] shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624 [18 USCS § 3624].

(b) **Place of imprisonment.** The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--

(1) the resources of the facility contemplated;
(2) the nature and circumstances of the offense;
(3) the history and characteristics of the prisoner;
(4) any statement by the court that imposed the sentence--
(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
(B) recommending a type of penal or correctional facility as appropriate; and
(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.



© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

22865424

5. STATUTORY AUTHORITY. 18 U.S.C. § 3624(c), provides:

"The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last ten per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's reentry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation Office shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody."

**18 U.S.C. § 3621(b)** provides:

"The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility . . . the Bureau determines to be appropriate and suitable." A CCC meets the definition of a "penal or correctional facility."

Therefore, the Bureau is not restricted by § 3624(c) in designating a CCC for an inmate and may place an inmate in a CCC for more than the "last ten per centum of the term," or more than six months, if appropriate.

pro



© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

22865424

**OPI:** **CPD**
**NUMBER:** **7310.04**
**DATE:** **12/16/98**
**SUBJECT:** **Community Corrections Center (CCC) Utilization and Transfer Procedure**

pro;



© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

22865424

**ROBERT L. MIHAILOVICH, ID # 33446-177, Petitioner, vs. FEDERAL BUREAU OF PRISONS, Respondent.**
**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**
**2007 U.S. Dist. LEXIS 22352**
**No. 3:06-CV-1603-N (BH) ECF**
**March 19, 2007, Decided**
**March 19, 2007, Filed**

CASE LAW

PROVING INMATES ARE TO RECIEVE EXTRA RRC TIME VIA 2241.

a Review of your documentation & Request was conducted by the Unit Mgr. All information was taken into consideration as well as your Disciplinary & adjustment issues. The Unit Manager contends that an appropriate decision was made for a Request of 6 months RRC Placement!

[signature] U/M
10/24/16



© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

22865424

Exhibit 2

AFFIDAVIT OF MICHAEL FIORITO

I, Michael Fiorito, swear under penalty of perjury the below is true and correct:

1. I arrived on or about the first week in August, 2016 to FCI Ashland in Ashland, KY.

2. Fiorito was encountered with Unit Manager Edwards during his first week at FCI Ashland with an issue that stemmed from Administrative Remedies. Upon speaking to Mr. Edwards Fiorito was told the issues with the Unit Team Staff who work for Mr. Edwards were "not my problem," according to Mr. Edwards. A Unit Manager is over and superior to all members of the Unit Team. This statement by Mr. Edwards was, in my belief, false.

3. When Mr Edwards told Fiorito that the issues Fiorito faced with the Unit Team were "not my problem" Edwards looked at Fiorito with condescention, disdain, and person animus. Edwards tone of voice and spittle emanating from his mouth toward Fiorito proved a level of hate as well.

4. At least one time during the conversation Edwards stated, "you white guys from up there [North] really think you're running things."

5. Edwards has been the topic of Fiorito's Administrative Remedy Process at least one time and, as a result, Mr. Edwards has been avoiding any conversation or contact with Fiorito.

6. On 10/17/2016 Mr. Edwards refused to accept a BP9 which was previously refused by Mr. Keller (counselor) and Mr. Nicely (counselor) and Mr. Guthrie (Case Manager).

7. Mr. Guthrie, for his part, was almost regal when he put up his hands as if in retreat and stated, "There are things going on now and I can't take that. You have to give it to Edwards."

8. At lunch on 10/17/2016 Fiorito attempted to hand a BP9 to Mr. Edwards and Edwards did, in fact, a Pieroette-like move to avoid touching the paper in Fiorito's hand. After spinning away from Fiorito, Mr. Edwards stated, "I'm not touching that..."

9. At that moment following the pieroette-like move by Mr. Edwards, acting Warden Bishop walked up to Fiorito and asked, "What's wrong?" Fiorito explained to her

that Mr. Keller would not accept the BP9 Fiorito had. He also explained that when he attempted to give this BP9 to Mr. Nicely (H Unit Counselor) Mr. Nicely stated, "never speak to me again." Fiorito explained that Keller was equally as disrespectful to Fiorito regarding acceptance of the Administrative Remedy. Warden Bishop listened attentively. Fiorito believes that the PLRA process was developed by **Congress** in order to address any issues which are, in fact, protected by a "right to redress grievances" within the First Amendment.

10. Warden Bishop then told Fiorito that on 10/17/2016 she, Mr. Edwards, and Fiorito would be sitting down and discussing all of these issues. Bishop did not follow through or Mr. Edwards refused the order of his superior, Warden Bishop.

11. Amazingly, not one member of the FCI Ashland Staff will accept the BP9 dealing with Mr. Edwards because, in Fiorito's opinion and belief, FCI Ashland employees are all frightened of being seen as "racists."

12. Fear of upsetting a fellow black employee (one of approximately six black employees at FCI Ashland) is a taboo situation at FCI Ashland. By assuring that the over 400 employees at FCI Ashland are never deemed as being "racist" these white government employees, in Fiorito's opinion and belief, bend over backwards and jump through rings of fire in order to avoid making these black employees feel discriminated against. If that means allowing Mr. Edwards to display racism toward inmates who are white and from the North the employees are fine with that, in Fiorito's opinion. After all, these white corrections officers are not from the North and they do not like the Northern inmates that much either.

13. In Fiorito's opinion and belief a corrections culture which avoids any potential race controversy at the detriment of inmates is yet another example of a loss of rights to prisoners all over the U.S.A. who are housed in federal facilities. All the guards are either AFGE members (American Federation of Government Employees) (depending on the strength of the local in that geographic location) **OR** these corrections officers are given the **option** to join at any time. In locations where the union is very strong, most of the corrections officers join and pay their dues. The administration staff (Warden, Unit Manager, Case Manager, Counselor) are not, typically,

protected by the union (AFGE) as well because they can be transferred to other locations much easier than the corrections officers who, in fact, grew up in the area where the prison is located. This creates a corrections culture that is absolutely beholden to the way in which these corrections officers were brought up as well as the way in which the corrections officers who trained them were brought up. Needless to say in Kentucky the belief structure is one that, in Fiorito's belief, is not very pleased with people from the North.

14. On more than one occasion for each prisoner from Kentucky Fiorito has heard the word "Yankee" used to describe him and others from the Greater Metropolitan Chicagoland Area. This reinforces the belief by Fiorito that these guards are not much different than their incarcerated fellow Kentuckians.

15. The ability to allow Mr. Edwards to treat prisoners is also a part of the unwritten 'code' among officers that allows them to perpetuate the largest 'gang' in America - officers whether federal, state, municipal, county, or otherwise, who carry guns and wear blue (typically). In Fiorito's belief these officers across the country who carry weapons and have a "fraternal" association are, in fact, a very close knit community that will, in Fiorito's belief, bleed blue for one another.

16. This ongoing reinforcement by FCI Ashland employees has allowed Mr. Edwards to be racist and cultivate his racism through and by improper treatment of inmates similarly situated at will. Mr. Edwards is known for doing negative things to white inmates from the North while simultaneously giving the benefit to the black (or sometimes white) inmates from the South.

17. This racism has caused Fiorito harm.

I, Michael Fiorito, swear under penalty of perjury the above is true and correct.

Date: 10/29/16

Michael Fiorito
Reg. No. 00414424
FCI ASHLAND/PO BOX 6001
Ashland, KY 41105